IN RE: Dawn A. SEGAL, Municipal Court Judge, First Judicial District, Philadelphia County

No. 3 JD 15

Court of Judicial Discipline of Pennsylvania.

FILED: December 16, 2016

Elizabeth A. Flaherty, Deputy Counsel

Stuart L. Haimowitz, Esquire

BEFORE: Honorable Jack A. Panella, P.J., Honorable Carmella Mullen, J.,[1] Honorable John J. Soroko, J., Honorable David J. Shrager, J., Honorable David J. Barton, J., Honorable Doris Carson Williams, J., Honorable Jeffrey P. Minehart, J.[2]

1. Judge Mullen's term on the Court expired during the pendency of this case. As the matter was in progress at the end of her term she continues to participate pursuant to Article V, § 18(b)(2) of the Pennsylvania Constitution and Internal Operating Procedure § 101.

2. Judge Minehart did not participate in this Decision.

## OPINION

### OPINION BY PRESIDENT JUDGE JACK A. PANELLA

The Judicial Conduct Board (Board) filed a Complaint with this Court on March 11, 2015, against Dawn A. Segal (Respondent), a Municipal Court Judge from Philadelphia. The Respondent was suspended without pay on February 2, 2016. Following a trial, the Respondent was adjudicated to have violated the following canons and constitutional provisions:

1. At Count 1, a violation of Canon 2B of the former Code of Judicial Conduct.[3] Former Canon 2B provided, in relevant part:

> Judges should not convey or knowingly permit others to convey the impression that they are in a special position to influence the judge.

The Respondent was found to have engaged in *ex parte* communications with former Judge Joseph C. Waters, Jr., about three cases that were pending before her.

2. At Count 2, a violation of Canon 3A(4) of the former Code of Judicial Conduct, which provided, in relevant part:

> Judges ... except as authorized by law, must not consider *ex parte* communications concerning a pending matter.

The Court found that the Respondent had engaged in repeated *ex parte* communications with Waters about three cases, **Houdini v. Donegal, City of Philadelphia v. Rexach**, and **Commonwealth v. Khoury**. With regard to the *Khoury* case, the record clearly demonstrates that Respondent made repeated improper *ex parte* contacts, and later gave assurances to Waters that she would do his bidding, i.e., that these communications were used

by the Respondent in her deliberations about these cases.

3. At Count 3, a violation of Canon 3B(3) of the former Code of Judicial Conduct, which provided:

> Judges should take or initiate appropriate disciplinary measures against a judge or lawyer for unprofessional conduct of which the judge becomes aware.

This finding was supported by the record because the Respondent failed, for a substantial period of time, to report the misconduct as stated in Counts 1 and 2.

4. At Count 4, a violation of former Canon 3C(1) which provided, in part:

> Judges should disqualify themselves in a proceeding in which their impartiality might reasonably be questioned but not limited to instances where:
>
> (a) they have a personal bias or prejudice concerning a party ....

Respondent's impartiality could have been reasonably questioned in each of the above referenced cases because Waters had asked for special treatment for particular litigants in each case and was told by Respondent that they would be treated accordingly. Moreover, the Respondent did not disclose to the litigants and attorneys who represented parties in these cases that she had engaged in *ex parte* conversations about the cases with Waters.

5. At Count 5, an automatic, derivative violation of Article V, § 17(b) of the Constitution of the Commonwealth of Pennsylvania, inasmuch as it was found that Respondent's conduct constituted violations of former Canons 2B, 3A(4), 3B(3) and 3C(1) of the former Code of Judicial Conduct.

---

3. The former Code of Judicial Conduct, which was superseded in 2014, was in effect for all relevant time-periods in this case.

6. At Count 6, a violation of Article V, § 18(d)(1) of the Constitution of the Commonwealth of Pennsylvania, conduct such that prejudices the proper administration of justice. The Court made a specific finding that by engaging in the *ex parte* communications and failing to recuse in each of the three cases cited above, the Respondent's conduct departed from the standard expected of judges and had the effect of obstructing or interfering with the proper and systematic operation of the Court. Furthermore, the Court found the Respondent's actions were knowing and intentional.

7. At Count 7, a violation of Article V, § 18(d)(1) of the Constitution of the Commonwealth of Pennsylvania, conduct such that brings the judicial office into disrepute. The Court found that the totality of the Respondent's actions was so extreme that it brought disrepute upon the entire state judiciary.

A hearing on sanctions was held on November 21, 2016, which was attended by the Respondent and her counsel as well as counsel from the Judicial Conduct Board. The Respondent testified and submitted a brief on sanctions. Additionally, the Respondent requested that we incorporate the testimony from the character witnesses who appeared at the time of trial on January 28, 2016.

We have said before that our judicial system should stand as the symbol of fairness and justice, and of equal protection dispensed to every citizen. We have also said that no type of corruption is tolerable in the Pennsylvania judiciary.

The Constitution provides a broad range of sanctions available to the Court which Include, but not limited, to removal from office, suspension, fine, and public or private reprimand.[4] When dealing with judicial misconduct, this Court has recognized that the sanction should fit the misconduct. Article V, § 18 of the Pennsylvania Constitution governs the review of our decisions. The Pennsylvania Supreme Court must review the record of the proceedings of the Court of Judicial Discipline: "on the law, the scope of review is plenary; on the facts, the scope of review is clearly erroneous; and, as to sanctions, the scope of review Is whether the sanctions imposed were lawful." PA. CONST. art. V, § 18(c)(2); *In re Berkhimer*, 593 Pa. 366, 371, 930 A.2d 1255, 1258 (2007).

## FACTORS CONSIDERED ON SANCTIONS

The Supreme Court of this Commonwealth is the sole authority on the issue of sanctions, and we take our guidance from that Court as well as from prior opinions of this Court. In *In re Toczydlowski*, 853 A.2d 24 (Pa.Ct.Jud.Disc. 2004), in considering the appropriate sanction, we made reference to *In re Deming*, 108 Wash.2d 82, 736 P.2d 639 (1987), a case decided by the Supreme Court of Washington, and we adopted that court's ten nonexclusive factors in fashioning an appropriate sanction. Our review of these factors in this case is as follows:

(a) Whether the misconduct is an isolated instance or evidenced a pattern of

proper administration of justice or brings the judicial office into disrepute, whether or not the conduct occurred while acting in a judicial capacity or is prohibited by law; or conduct In violation of a canon or rule prescribed by the Supreme Court.
PA. CONST. art. V, § 18.

---

**4.** Article V, § 18(d)(1) of the Pennsylvania Constitution provides:
A justice, judge or justice of the peace may be suspended, removed from office or otherwise disciplined for ...; violation of section 17 of this article; misconduct in office; neglect or failure to perform the duties of office or conduct which prejudices the

conduct: The misconduct giving rise to the charges in this case involves three separate cases which were before the Respondent during her service as a municipal court judge.

(b) The nature, extent and frequency of occurrence of the acts of misconduct: This consideration is similar to the first factor, and we note that the contacts made by former Judge Waters were not rejected or refused by the Respondent. Additionally, we found substantial evidence supporting our conclusion that these contacts gave the appearance of influencing her decisions in those cases. The Respondent took no steps to report the conduct in issue, as to Waters or herself, until after she was notified that she had been recorded on an authorized wiretap conducted by the FBI.

(c) Whether the conduct occurred in or out of the courtroom: The phone conversations took place in the courthouse and the contacts were made using government equipment in judicial chambers.

(d) Whether the misconduct occurred in the judge's official capacity or in his private life: The actions which brought about these charges were related to the Respondent's official responsibilities.

(e) Whether the judge has acknowledged or recognized that the acts occurred: The Respondent's initial position in this case was that her conduct and inaction should not be considered violations of the canons or the constitution because she was able to rule upon these three cases fairly and without regard to the *ex parte* communications from Waters. However, the Respondent definitely had knowledge that the misconduct was occurring and that It was improper, at the time it happened. Her behavior runs counter to our citizens' perceptions of justice and the operation of the judiciary. This type of conduct strips the system of credibility and integrity. The Respondent, in a statement which we can only say was sincere and heartfelt, acknowledged this perception of corruption at the sanctions hearing held on November 21, 2016:

> So I wanted to stand before the Court before we go any further and say I was wrong, I should have protected the process. I know that I reflected poorly on my court and other judges by not protecting the process. Regardless of whether I thought I was doing the right thing or not, I didn't do that.

> I feel awful about the negative light that I've portrayed my colleagues, who are trying to give justice and do the right thing, by not protecting the process. I feel awful about that. I stand before you to say that.

(f) Whether the judge has evidenced an effort to change or modify his conduct: The Respondent eventually reported these *ex parte* communications to the Judicial Conduct Board, however, this self-reporting only occurred after she had been confronted by the FBI of the existence of the wiretap, which was months after the *ex parte* conversations had occurred. At the hearing on sanctions held on November 21, 2016, the Respondent expressed great remorse for her conduct, especially in her decision to not recuse from the cases referenced herein. Additionally, she testified: "I should have stopped it right there; I should have stopped his call and said, 'Stop calling' and reported him, and I didn't do it."

(g) The length of service on the bench: Respondent began her service as a Judge on the Municipal Court of Philadelphia on January 4, 2010.

(h) Whether there have been prior complaints about this judge: The Court of

Judicial Discipline knows of no prior complaints against the Respondent.

(i) *The effect the misconduct has upon the integrity of and respect for the judiciary:* The misconduct here goes to the sanctity of the judicial process—it involved manipulating cases for reasons other than the evidence presented, and the conduct involved a *pattern* of this conduct when the judicial officer was contacted by way of an *ex parte* source.

(j) *The extent to which the judge exploited her position to satisfy her personal desires:* The Respondent explained her conduct, and lack of action, on her fear of the political system governing the election and retention of judges in Philadelphia. However, the practice of fixing cases has led to the removal of judges in the past. *See In re Zupsic*, 893 A.2d 875 (Pa.Ct.Jud.Disc. 2005).

Of special concern to the Court is that the conduct here clearly prejudiced the proper administration of justice. *See In re Cioppa*, 51 A.3d 923, 930 (Pa.Ct.Jud.Disc. 2012). We have repeatedly held this violation of the Constitution carries the added element of a mental state in which the judge not only knew that the conduct in issue consisted of some neglect or impropriety, "but also acted with the knowledge and intent that the conduct would have a deleterious effect upon the administration of justice, for example, by affecting a specific outcome." *In re Smith*, 687 A.2d 1229, 1238 (Pa.Ct.Jud.Disc. 1996). In *Houdini v. Donegal*, the rights of a private litigant to a fair and timely hearing were dramatically obstructed by way of the *ex parte* conversation between Waters and the Respondent.

## CONCLUSION

At the hearings before this Court, the following witnesses appeared and presented character testimony on behalf of the Respondent:

Michelle Herman

Matthew Haggerty, Esq.

Susan Buchwald

R. Patrick Link, Esq.

William L. Banton, Esq.

Hon. Jane C. Greenspan (retired)

Hon. Howard Wishnoff

Ellen Greenlee, Esq.

 We have great respect and commend these witnesses for appearing and providing their testimony. However, as our Supreme Court said in 2007:

The existence of good character evidence does not undo appellant's offensive behavior. Disciplinary sanctions focus beyond the one who is charged, to the message sent to the public and the effect on the expectation of standards of behavior. "[D]isciplinary sanctions ... are intended to protect the public ... and maintain the integrity of the legal system."

*In re Melograne*, 585 Pa. 357, 888 A.2d 753, 755 (2005). [T]the purpose of our review is not to re-weigh the sanction against aggravating or mitigating circumstances, but to determine whether the sanction is lawful. **The Court of Judicial Discipline is charged with protecting the integrity of the judiciary and upholding public confidence in the judicial branch of government. [*In re*] *Melograne* [571 Pa. 490], 812 A.2d [1164] at 1168–69 [ (2002) ].** "In disciplining a judicial officer for his misconduct, that tribunal not only punishes the wrongdoer, but also repairs the damaged public trust and provides guidance to other members of the judiciary regarding their conduct." *Id.*, at 1168.

*In re Berkhimer,* 593 Pa. 366, 930 A.2d 1255, 1259–60 (2007) (emphasis added).

While we also acknowledge the sincere apologies extended by the Respondent at the sanctions hearing, our review is necessarily focused on additional factors. The purpose of these proceedings is not to impose punishment on the respondent judge, or to exact any civil recovery, but to protect the people from corruption and abuse on the part of those who wield judicial power. After reviewing all the evidence in this case, we must reject respondent's earlier contention that the problems here were all created by Waters and his corrupt motives. We find nothing in the record which even remotely suggests that Respondent's misconduct was anything but fully voluntary and done to protect her own political welfare. Based on the overwhelming nature of the evidence in this case by way of the wiretapped conversations, and in light of the clear mandates of the canons and constitutional provisions, we conclude that Respondent's conduct shows she knowingly acted in derogation of the judicial canons and, therefore, her actions amounted to willful misconduct.

It cannot be reasonably disputed that Respondent was approached by a corrupt judge. However, rather than refuse to participate in his requests, she complied and willfully engaged in the *ex parte* appeals that he extended.[5] As we have said in more detail In prior decisions, when it comes to corrupt acts and the derogation of a fair and just judicial process, a judge must have "the willingness to stand up for what was right and buck a corrupt tide."

### ORDER

AND NOW, this 16th day of December, 2016, after a hearing in which the Court received arguments from counsel and testimony from Respondent, and having considered the Findings of Fact and Conclusions of Law in the Court's July 21, 2016, and September 23, 2016, decisions;

It is ORDERED and DIRECTED that Respondent, Dawn A. Segal is REMOVED FROM OFFICE and shall be ineligible to hold judicial office in the future.

---

5. There is no doubt our decision on sanctions would be different if Respondent had, at the least, recused from the cases which Waters had called her about.